Usama Kahf (SBN 266443)
E-Mail: ukahf@fisherphillips.com
Andrew E. Saxon (SBN 227344)
E-Mail: asaxon@fisherphillips.com
FISHER & PHILLIPS LLP
2050 Main Street, Suite 1000
Irvine, California 92614
Telephone: (949) 851-2424
Facsimile: (949) 851-0152

Attorneys for Plaintiff
KEENAN & ASSOCIATES

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KEENAN & ASSOCIATES,<br><br>               Plaintiff,<br><br>      v.<br><br>ABD INSURANCE AND FINANCIAL SERVICES, INC. dba NEWFRONT, a Delaware Corp.; and KEITH BROWN, an individual,<br><br>               Defendants. | **Case No: #**<br><br>**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF:**<br><br>1. Misappropriation of Trade Secrets in Violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq*.;<br>2. Breach of Contract;<br>3. Breach of Fiduciary Duty;<br>4. Tortious Interference with Contract<br><br>**DEMAND FOR JURY TRIAL** |

1

FP 43686929.6

Plaintiff Keenan & Associates ("**Plaintiff**" or "**Keenan**"), by and through its undersigned counsel, hereby brings this Complaint for damages and injunctive relief against Defendants ABD Insurance and Financial Services, Inc. dba Newfront ("**Newfront**") and Plaintiff's former employee Keith Brown ("**Brown**" or "**Defendant**"), for violations of the federal Defendant Trade Secrets Act, 18 U.S.C. § 1836 *et seq.*, Brown's breach of his Employment Agreement with Plaintiff (the "**Agreement**," attached hereto as Exhibit A), Brown's breaches of his fiduciary duties to Plaintiff, and for Newfront's tortious interference with his Agreement. In support thereof, Keenan avers as follows:

## INTRODUCTION

1.       Keenan is a commercial and benefits insurance brokerage that just discovered that its former long-term employee, Brown, took a swath of trade secret and confidential files in anticipation of his departure to join Newfront. Brown downloaded, saved, and/or copied numerous Keenan documents onto an external USB device before he quit and after he accepted a job offer with Newfront, a direct competitor of Keenan. The documents Brown stole and retains in his possession to this day are more valuable today than they were six months ago when he resigned, and they will be most valuable to Brown in his competitive role over the coming weeks as clients he serviced at Keenan are up for renewal of their insurance business. The non-publicly available information he stole would give him and Newfront an advantage in soliciting these clients' business. Indeed, Brown has already solicited multiple clients and successfully diverted one client to his new employer since his resignation from Keenan, an effort that could not have been accomplished without the use of trade secrets and confidential information about these clients.

2.       Prior to discovering Brown's theft of company files through computer forensics shortly before the filing of this Complaint, Keenan sought assurances from Brown that he would abide by his confidentiality agreement. Responding on his behalf, Newfront proclaimed that Brown has not done anything to violate his agreement. As it turns out, that was just as much of a lie as was Brown's representation that he had returned all Keenan documents at the time of his departure. The truth about Brown's pre-resignation conduct came to light after computer forensics experts recently imaged Brown's Keenan laptop, revealing the systematic downloading of Keenan trade secrets in preparation for Brown's new endeavors at Newfront. As a result, having just discovered that Brown is in possession of Keenan

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

FP 43686929.6

trade secrets pertaining to clients he serviced at Keenan that are up for renewal over the coming weeks (with pre-renewal discussions and planning underway), and in light of Brown's successful efforts to divert one client to Newfront while in possession of Keenan trade secrets and his (and Newfront's) lies that sought to put Keenan off the scent, Keenan now faces imminent irreparable harm that only immediate injunctive relief can prevent.

3.     April and May are the months during which certain Keenan clients are most vulnerable to poaching, and this is certainly true for the public sector employee benefits programs which Brown serviced. With Brown poised to consummate the transfer of business to his new employer—aided immeasurably by the misappropriation of Keenan trade secrets that forensic analysis already proves— Keenan stands at the precipice of significant irreparable harm absent immediate and emergency relief: (a) Brown must turn over all devices, all files, all documents, all emails, anything and everything that he stole from Keenan; (b) Brown must respond to expedited discovery to ensure those USB devices do not show plug-in activity to his new employer's devices and to allow discovery of the extent of his misappropriation and other contract breaches; and (c) other relief as set forth in the accompanying motion for temporary restraining order. Even after the exigency of this time is over, Keenan must have opportunity to prove its damages case and subject Brown to permanent injunctive relief.

## JURISDICTION & VENUE

4.     This Court has jurisdiction over this action under 28 U.S.C. § 1331 because this action arises under the federal Defend Trade Secrets Act ("DTSA"). This Court has supplemental jurisdiction over Keenan's supplemental state law causes of action under 28 U.S.C. § 1367.

5.     Venue is proper in the Eastern District of California pursuant to 28 U.S.C. § 1391(b)(1) because Brown resides in Elk Grove, California, which is in this judicial district, and Newfront has an office in Sacramento, California, which is also in this judicial district.

## PARTIES

6.     Keenan is a California corporation with its principal place of business in Torrance, California. Keenan is 100% owned by AssuredPartners Capital, Inc., a Delaware corporation with its principal place of business in Lake Mary, Florida.

7.     Defendant ABD Insurance and Financial Services, Inc. ("ABD Inc.") is a Delaware

3

corporation maintaining its principal place of business in San Mateo, California. Plaintiff is informed and believes, and based thereon alleges, that ABD Inc. is the surviving company of a January 1, 2022 merger of three insurance agencies, one of which was Newfront Insurance Services, LLC. Plaintiff is further informed and believes, and based thereon alleges, that ABD Inc. continues to use the name "Newfront" in its branding and operates as an insurance brokerage.

8.      Defendant Keith Brown is an individual who, upon information and belief, is a resident of Elk Grove, California.

9.      Personal jurisdiction is proper in this Court because Defendant is a resident of California and because he has engaged in unlawful conduct in California, which has caused harm to Keenan.

## GENERAL ALLEGATIONS COMMON TO ALL COUNTS

### A.      Background and Business of Keenan

10.      Keenan is among a family of insurance brokerages owned by AssuredPartners Capital, Inc. and its related companies (collectively, the "**Assured Group**"). The Assured Group is a national brokerage firm founded in 2011 as a partnership of leading independent property, casualty, and employee benefits brokerages. The Assured Group has over 180 physical locations across North America and provides insurance services to individuals and businesses in numerous industries, such as aerospace, agriculture, senior living, financial services, manufacturing, and real estate, among many others.

11.      Since 2011, the Assured Group has invested heavily in high growth strategies through its successful model of partnering regional insurance brokerages with the resources of a nation-wide family of brokerages, enabling cross-marketing revenue generation and expanding market share through the combined experience and know-how for marketing and business development through hiring, retention, and training of insurance producers who drive revenue. Doing so has enabled the Assured Group family of local and regional insurance brokerages to continue to capture market share across numerous lines of insurance products and services throughout the nation.

12.      One such member of the Assured Group is Keenan. Keenan was founded in 1972 and, by 2017, grew to be the largest independent private agency domiciled in California. It is a California-centric insurance brokerage, third party administrator and service company providing a comprehensive suite of property-casualty and employee benefits products and services, primarily in industries of public agencies

(schools K-12 and community colleges and municipalities/counties) and Healthcare. In 2017, AssuredPartners, Inc. acquired Keenan. Keenan continues to operate throughout the State of California.

13.    As an insurance brokerage, Keenan relies upon and invests heavily in the success of its individual insurance producers. These producers leverage their experience, expertise, and the Assured Group's national resources to generate new business, whether through relationships with new clients or through sales of new lines to existing clients. Repeat business through insurance renewals from existing clients is of paramount importance to the success and growth of Keenan. Keenan invests in its producers to ensure they continue to nurture and develop the Keenan book of business assigned to and/or generated by an individual producer.

**B.    Keenan's Trade Secrets**

14.    Equally critical to Keenan's success, however, is its investment into the development and safeguarding of the confidential and trade secret information central to the business platform. Through careful and consistent enforcement of lawful confidentiality policies and contractual obligations and implementing other physical and electronic security measures, Keenan protects its prized assets – the trade secret and confidential information acquired and developed through continued investment.

15.    Keenan devotes substantial resources to the protection of information critical to the success of the business where the value of such information depends on it being maintained as confidential and used only for the benefit of Keenan. As alleged herein, Keenan treats such information as its trade secrets (hereinafter referred to as "**Trade Secrets**" or "**Keenan Trade Secrets**"), which is non-public information concerning the operations, business methods, personnel, costs and finances, marketing plans, research, sales, pricing data and legal affairs of Keenan and its clients. Keenan Trade Secrets include, but are not limited to:

    a.    The identities, goals, needs, strategic plans and account information of Keenan clients;

    b.    The identities, goals, needs, and preferences of individual decision makers employed by Keenan clients;

    c.    The amount of premiums and commissions paid and/or generated by the sale of particular Keenan products or services and/or by the sale of Keenan products or services to a particular

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

Keenan client;

d.    Insurance and/or contract renewal timetables for any Keenan client;

e.    The terms (including, without limitation, pricing and billing information) of any contract between Keenan and any Keenan client; and

f.    Keenan's data files (including, without limitation), AMS Sagitta, GenSource products, SBPA GBAS, Keenan Intranet Data Warehouse), working papers, reports, procedure manuals and modules.

16.    Keenan developed, compiled, and acquired its Trade Secrets at great expense and through substantial efforts. Keenan's Trade Secrets are not readily ascertainable in the insurance industry or in any type of trade or public directory or any other source.

17.    The misuse of Keenan's Trade Secrets, whether through the improper disclosure or improper use for a non-Keenan business purpose, would cause significant damage to Keenan through potential loss of business and business opportunity, loss of goodwill, loss of employees through unfair and unlawful means, damage to reputation, and other types of harm.

18.    As such, Keenan takes careful, deliberate actions at great expense to protect against the misuse or wrongful disclosure of Keenan Trade Secrets. Keenan has taken steps reasonable under the circumstances to maintain the secrecy of its Trade Secrets, such as: (a) emphasizing to employees Keenan's need to keep this information a secret; (b) requiring, as a condition of employment that all employees promise not to use or disclose this information except in the performance of their duties for Keenan; (c) having employees execute confidentiality and non-disclosure agreements that instruct Keenan's employees not to disclose, reproduce or use this information without Keenan's consent; (d) distributing confidentiality policies that all employees must specifically acknowledge, as well as employee handbooks containing confidentiality requirements; (e) limiting access and/or restricting access to this information by employees on a need-to-know basis; (f) requiring unique usernames and passwords to access Trade Secrets on Keenan's computer systems and databases; and (g) implementing a number of physical and electronic security measures, including restricting access to databases and network space, assigning passwords and user-level permissions to access information on Keenan's computer system, servers, and networks, encrypting Keenan laptops issued to employees, and requiring

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

FP 43686929.6

that Trade Secrets be kept in secure locations when not in use.

19.    For example, the employee handbook used by Keenan in 2021 obligates all Keenan employees to specifically acknowledge, and be bound by, provisions identifying in detail the nature of Keenan Trade Secrets and obligating employees to protect such information. The 2021 California Employee AP Handbook used by Keenan states in pertinent part:

> **Trade Secrets and Confidential Information**
>
> AssuredPartners' trade secrets, confidential and proprietary information ("Trade Secret and Confidential Information") is vital to our entire business. During your employment with AssuredPartners, you will be provided with, have access to, and be required to maintain strict confidentiality of, Trade Secret and Confidential Information. This Trade Secret and Confidential Information is not known by AssuredPartners' competitors or within the insurance brokerage business generally.
>
> AssuredPartners' Trade Secret and Confidential Information includes all confidential, proprietary, and/or non-public information, whether or not in a written or recorded, electronic or non-electronic, form, concerning the business or affairs of AssuredPartners. Although it would be impossible for AssuredPartners to list each and every document or category of Trade Secret and Confidential Information to which you will be provided access in your employment with AssuredPartners, below are recognized categories and examples of each such category:

A copy of the pertinent pages of this Handbook is attached hereto as Exhibit B.

20.    Further, as part of Keenan's efforts to protect its Trade Secrets, Keenan does not allow insurance producers access to Keenan Trade Secrets until after the producers execute a written confidentiality agreement whereby producers acknowledge they will have access to Keenan Trade Secrets, promise not to disclose Keenan Trade Secrets to anyone not authorized to receive it, and to confirm they will not use Keenan Trade Secrets except for legitimate business purposes for the benefit of Keenan. Producers also agree that confidentiality obligations survive the termination of their employment relationship with Keenan, that they will continue to treat Keenan's Trade Secrets as confidential, that they will not disclose Keenan's Trade Secrets to any third party, and that they will not retain Keenan Trade Secrets. Finally, producers acknowledge that the Keenan Trade Secrets are the sole and exclusive property of Keenan. Exhibit A, Paragraph 4.a, 4.b, and 9.b.

21.    Keenan also guards the confidentiality of its Trade Secrets by enforcing its contracts protecting its Trade Secrets. Keenan does not tolerate violations of confidentiality provisions and takes steps to enforce its rights, from cease and desist letters to litigation seeking emergency or preliminary and permanent injunctive relief, when, for example, producers violate their employment and post-

7

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

employment confidentiality obligations. Keenan has routinely enforced the terms of its employment agreements in recent years to protect against the use and disclosure of its Trade Secrets.

22.    Because of the nature of the Trade Secrets, Keenan's commitment to enforce its confidentiality agreements, the fact that the Trade Secrets derive value by virtue of being confidential, and the fact that the Trade Secrets cannot be obtained from public sources by competitors, Keenan's Trade Secrets are trade secrets under federal law.

23.    In the course and scope of his duties for Keenan, Brown had access to, regularly used, and was responsible for maintaining and safeguarding Keenan Trade Secrets from use and disclosure for a competitive purpose.

**C.    Keenan Confidential Information**

24.     Further, to the extent Keenan Trade Secrets are not considered trade secrets under applicable law, such information is protected as confidential information under the Agreement (hereinafter referred to as "**Confidential Information**" or "**Keenan Confidential Information**").

25.    Keenan Confidential Information encompasses all information belonging to Keenan other than Trade Secrets (as defined above) that is proprietary and confidential in nature, whether the information is reduced to writing or in a form from which such information can be obtained, translated or derived into reasonably usable form, and whether the information is simply in an employee's head, that: (a) has been provided to the employee during his/her employment with Keenan; (b) the employee has gained access to while employed by Keenan; and/or (c) was developed by the employee in the course of his/her employment with Keenan.

26.    Examples of Keenan Confidential Information include, but are not limited to:

a.    information believed by Keenan to be a trade secret (as defined above) that ultimately does not qualify as a trade secret under applicable law but nonetheless was maintained by Keenan as confidential;

b.    the non-trade secret but still proprietary or confidential methodologies, strategies, programs, and systems used by Keenan in managing assets, liabilities, and risk and/or in soliciting, marketing, selling and providing services to its clients;

c.    private and confidential communications with Keenan's clients, vendors,

8

FP 43686929.6

insurance carriers, and consultants;

        d.     non-trade secret but still confidential or private information of third parties that Keenan has contractual and/or legal obligations to maintain as confidential, including all client information that Keenan and its employees are restricted from disclosing by federal, state or local statutes or regulations;

        e.     non-trade secret but still proprietary or confidential financial and accounting information of Keenan;

        f.     non-trade secret but still proprietary or confidential information concerning Keenan's current and prospective clients and vendors (including, but not limited to, information that clients and vendors expect Keenan to keep as confidential);

        g.     non-trade secret but still proprietary or confidential information concerning Keenan's consultants, independent contractors, and vendors (including lists of all the foregoing); and

        h.     personnel files and employment-related records of Keenan's current and former employees (including, but not limited to, information related to the hiring, recruitment, retention, and termination of its current and former employees, as well as information related to their job duties, assignments, skills, training, performance, discipline, promotions, compensation, benefits, leaves of absence, and medical files).

        27.     As with its Trade Secrets, Keenan takes the same reasonable measures to protect against the misuse and wrongful disclosure of Keenan Confidential Information. These measures include, but are not limited to: (a) emphasizing to employees Keenan's need to keep this information a secretKeenan; (b) requiring, as a condition of employment that all employees promise not to use or disclose this information except in the performance of their duties for Keenan; (c) having employees execute confidentiality and non-disclosure agreements that instruct Keenan's employees not to disclose, reproduce or use this information without Keenan's consent; (d) distributing confidentiality policies that all employees must specifically acknowledge, as well as employee handbooks containing confidentiality requirements; (e) limiting access and/or restricting access to this information by employees on a need-to-know basis; (f) requiring unique usernames and passwords to access Trade Secrets on Keenan's computer systems and databases; and (g) implementing a number of physical and electronic security

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

FP 43686929.6

measures, including restricting access to databases and network space, assigning passwords and user-level permissions to access information on Keenan's computer system, servers, and networks, encrypting Keenan laptops issued to employees, and requiring that Trade Secrets be kept in secure locations when not in use.

28.    In the course and scope of his duties for Keenan, Brown had access to, regularly used, and was responsible for maintaining and safeguarding Keenan's Confidential Information from use and disclosure for a competitive purpose.

**D.    Brown and the Agreement**

29.    Brown joined Keenan on August 20, 2003.

30.    As a condition of starting employment with Keenan, Brown agreed to the terms of the Agreement.

31.    The Agreement defines "Confidential Information" and restricts its retention, use, or disclosure as follows:

> 4.    Confidential Information.
>
> a.    In the course of Employee's employment with the Company, Employee has already acquired or will acquire access to confidential and proprietary information of the Company ("Confidential Information") including, without limitation, Confidential Information concerning the operations, business methods, personnel, costs and finances, marketing plans, research, sales, pricing data and legal affairs of the Company and its subsidiaries, affiliates, clients and vendors. Certain of that Confidential Information has been, and/or hereby is, expressly identified to Employee as "Confidential Information" or "Trade Secret" including, but not limited to: (i) the identities, goals, needs, strategic plans and account information of Company clients; (ii) the identities, goals, needs, and preferences of individual decision makers employed by Company clients; (iii) the amount of premiums and commissions paid and/or generated by the sale of particular Keenan products or services, and/or by the sale of Keenan products or services to a particular Company client; (iv) insurance and/or contract renewal timetables for any Company client; (v) the terms (including, without limitation, pricing and billing information) of any contract between the Company and any Company client; and (vi) the Company's data files (including, without limitation, AMS Sagitta, GenSource products, SBPA GBAS, Keenan Intranet Data Warehouse), working papers, reports, procedure manuals and modules. Such information is Confidential Information whether it is intangible (such as a fact known to Employee but not recorded), recorded in written form (as in report or manual) or otherwise recorded (as in an audiotape, film, computer disk or on the Company's network). Employee understands and agrees that the Company's Confidential Information: has independent economic value by not being generally known to the public, competitors of the Company or others who could otherwise obtain economic value from its disclosure or use; is not readily ascertainable from public sources; has been developed and compiled by virtue of the Company expending significant time, effort and cost; and has been, and is, subject to diligent efforts by the Company to maintain the secret, confidential and proprietary nature thereof.

Exhibit A, Paragraph 4.a.

32.    The Agreement also prohibits Brown from using or disclosing Keenan Confidential Information except as required during the course and scope of his employment with Keenan:

> b.    Without the prior written consent of the Keenan Board, Employee shall not use any Confidential Information or disseminate or disclose any Confidential Information to any Person, whether directly or indirectly, except to the limited extent actually required for Employee to perform his or her responsibilities in the course of his/her employment with the Company.  If Employee becomes aware that anyone is engaged in the unauthorized disclosure of Confidential Information, Employee shall immediately inform his/her Manager or the Company's Legal Department.  Employee understands and agrees that Employee's obligation to maintain the confidentiality of all Confidential Information shall survive the termination of Employee's employment with the Company, and such obligation shall continue for all time.

Exhibit A, Paragraph 4.b.

33.    Brown also acknowledged and agreed that all electronic files and records relating to Keenan's business are exclusively the property of Keenan and shall be returned to Keenan at the conclusion of his employment with Keenan:

> b.    All files (hard copy or saved on Employee's computer, personal or shared drives), records, documents, equipment, specifications, electronic mail and other items relating to the Company's business, whether prepared by Employee or others (collectively, "Company Materials"), are and shall remain exclusively the property of the Company.  Upon the ending of Employee's employment with the Company for any reason, and at such earlier time as may be requested by the Company, Employee shall forthwith deliver to the Company all Company Materials and all materials in Employee's possession, custody or control and shall not download, delete, transfer or transmit any Company Materials without Company oversight or approval beforehand.

Exhibit A, Paragraph 9.b.

34.    Brown committed in the Agreement that Keenan would be entitled to injunctive relief in the event that he violated any of its terms:

> 12. <u>Injunctive Relief</u>.  The parties acknowledge and agree that the provisions set forth in this Agreement are necessary and reasonable to protect the interests of Employee and the Company, and that any breach or threatened breach of any provision of this Agreement by either party could cause great and irreparable harm to the other party, for which there would be no adequate remedy at law.  Therefore, in addition to any other rights and remedies the parties may have, and notwithstanding any arbitration agreement into which they have entered, the parties agree that either party, without the necessity of proving actual damages, may seek temporary and permanent injunctive relief in an appropriate court in the County of

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

FP 43686929.6

Los Angeles, State of California to prevent the other party from breaching or continuing to breach this Agreement. The parties agree that the venue is deemed proper in Los Angeles County due to the location of the Company's principal place of business and where any breach of the contract will occur. The parties further agree that the party seeking injunctive relief may obtain such relief without posting a bond or making any undertaking. Any such requirement of a bond or undertaking is hereby waived, and the parties acknowledge that in the absence of such a waiver, a bond or undertaking might otherwise be required by the Court. Nothing herein shall prevent either party from pursuing any other legal or equitable remedy available to it for a breach or threatened breach of this Agreement, including but not limited to the recovery of damages.

Exhibit A, Paragraph 12.

35.    In Paragraph 14 of the Agreement, Brown agreed that the contract would be governed by California law.

36.    Finally, in Paragraph 18 of the Agreement, Brown agreed that in the event that he breached the contract, then Keenan would be entitled to recover its costs and expenses, including reasonable attorneys' fees:

18. Attorney's Fees. In the event it becomes necessary for either party to bring an action to enforce, or for breach of, any provision of this Agreement, then: (1) if such action is subject to arbitration pursuant to any arbitration agreement then in force between the parties, the entitlement of the prevailing party to recover costs and expenses incurred by the party in the action -- including, without limitation, reasonable attorneys' fees –shall be governed by such arbitration agreement; and (2) if such action is not subject to arbitration, the prevailing party shall be entitled to recover costs and expenses incurred by the party in the action -- including, without limitation, reasonable attorneys' fees.

Exhibit A, Paragraph 18.

**E.    Brown's Duties at Keenan.**

37.    After executing the Agreement on or about August 20, 2003, Brown started working for Keenan.

38.    Brown worked as an Account Manager for the first 15 years of his employment with Keenan until he was promoted to Vice President, a role he remained in until he resigned. For the entirety of his employment, Brown specialized in the provision of insurance products and services to public sector clients in need of employee benefits consulting. Brown's particular specialty involved providing employee benefits consulting to "Joint Powers Authorities" or "JPAs" formed by public school districts

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

FP 43686929.6

and to the individual school districts within those JPAs.

39.     A JPA is a legally created entity distinct from its constituent members that allows two or more public agencies to jointly exercise common powers. As relevant here, JPAs offer insurance-pooling and volume-based purchasing options for school districts that want to purchase insurance or related insurance services, and often to purchase lower-cost medical and dental benefits for teachers and district employees.

40.     The process by which Keenan, and other competitors in the field, become a "broker of record" for a JPA is largely distinct from the way in which brokerages compete for commercial insurance lines. JPAs award contracts to brokers through a public bidding process in response to a Request for Proposal (RFP). Whereas commercial insurance products are typically driven by annual renewals, JPAs issue RFPs sometimes annually, but it may be every two years, or much longer. And once in contract, a broker such as Keenan would be the contractual broker to that JPA until the term of the contract is concluded. In contrast, insureds in the commercial setting may transfer their business at any time from one broker to the next through a "broker of record" appointment letter, or "BOR letter."

41.     A broker-of-record ("BOR") letter is an appointment letter used in the insurance industry to inform insurance carriers of an applicant's or insured's designation of an insurance broker to act on its behalf. It is typically used to signal the appointment of a broker for the first time or to replace an existing broker of record with a new one. When an insurance brokerage receives a broker-of-record letter reflecting the new appointment of a different insurance broker on behalf of an existing client, it informs the brokerage of the transfer/loss of business.

42.     The JPA, however, is just the tip of the iceberg. Its member school districts often separately purchase ancillary lines of insurance and will appoint a broker of record who may or may not be the broker of record for the JPA. Keenan thus markets is employee benefits services to JPAs and their constituent members.

43.     For example, in 2021, Brown oversaw a book of business of roughly $1.8 million in revenue that included 2 JPAs and approximately 58 individual school districts.

44.     Brown himself brokered, produced, and serviced JPAs and school districts on Keenan's behalf for over twenty years. In so doing, Brown's duties for Keenan are typical of any insurance

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

producer, including: (a) the use of sales techniques to identify prospects; (b) engaging in frequent communications with Keenan clients to build relationships and address those clients' insurance needs; (c) working with account executives to develop renewal and marketing strategies; (d) developing relationships with carriers by becoming familiar with and executing strategies developed for satisfying carrier goals and objectives, and participating in carrier sponsored activities; and (e) working with other employee benefits specialists in the Assured Group to develop the Assured Group's overall strategy for taking care of clients in this line of business.

45.     The employee benefits clients that Brown specializes in servicing require constant attention and service from their insurance providers because the nature of the business is such that the clients face numerous potential sources of liability and therefore have unique needs unlike those of most other businesses. As a result, Brown and his team had substantial client contact on behalf of Keenan and gained a substantial amount of confidential information about their clients' businesses and insurance needs.

46.     The clients that they serviced are located throughout Northern California, though Brown lived in Elk Grove, California.

47.     In consideration for the services he provided, Keenan paid Brown a salary plus commissions.

**F.     Brown's Resignation from Keenan and Joining with Newfront.**

48.     In early 2021, Keenan was planning a restructuring that included a promotion for Brown. Based upon information and belief, despite informing Brown that he would receive a promotion, it is this restructuring that led Brown to grow discontent with his employment at Keenan.

49.     By no later than the spring of 2021, Brown was interviewing—according to what he later told Keenan—with "many firms."

50.     No later than June 2021, Brown was interviewing with Newfront to join Newfront's team and directly compete with Keenan. On June 14, 2021, Brown met with several Newfront executives, including its CEO Spike Lipkin.

51.     Unbeknownst to Keenan, and as further alleged below, Brown spent those summer months, not only planning to leave Keenan, but downloading and preparing to take with him Keenan

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

FP 43686929.6

Trade Secrets and Confidential Information with the intent of misappropriating that information for the benefit of his future employer.

52.    Also unbeknownst to Keenan, on or about July 28, 2021, Brown received his formal job offer from Newfront, and on or about August 16, 2021, Brown entered into an Employment Agreement for Producer Services with Newfront ("**Brown's Newfront Employment Agreement**"). Brown's Newfront Employment Agreement identified his start date as October 5, 2021 and that he would hold the position of Principal & Employee Benefits Strategist.

53.    Keenan first became aware that Brown had been looking for new employment on the evening of August 31, 2021, when Brown telephoned his supervisor, Kelly Hall ("Hall"), to verbally provide his two-week notice of resignation. Brown explained to Hall that he was going to be joining Newfront where he intended to "do something different," that he "no longer wanted to work with schools," and that he instead wanted to help insureds local to his area, rather than the districts in other counties. He also told Hall that he had "interviewed with lots of firms" but in the end decided to join Newfront—a brokerage that at the time lacked a public sector business—because "he didn't want to sit across the table from Keenan and compete."

54.    Although Newfront was and is a Keenan competitor, Brown expressly assured Keenan that he would be working in the commercial sector and would not compete with Keenan's business in the public sector. This representation was false, intended to lull Keenan into a sense of security that Brown did not intend to solicit the Keenan accounts Brown serviced.

55.    On September 3, 2021, Brown submitted his 2-week notice of resignation by email.

56.    Keenan requested, and Brown agreed, to extend his resignation notice until September 30, 2021. Keenan asked Brown to stay longer, having been put at ease by Brown's assurance he was leaving the public entity sector and would not compete with Keenan. Brown said he would "check with Newfront but it shouldn't be a problem." Brown then agreed to extend his notice period until the end of September.

57.    On September 29, 2021, Keenan conducted an exit interview with Brown, provided him a copy of the Agreement, and reminded him of his obligation to return all Keenan Trade Secrets and Confidential Information in his possession.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

58.     Brown's last day with Keenan was September 30, 2021. He returned his Keenan-issued computer and represented to Keenan that he had no other Keenan files or Keenan Trade Secrets Confidential Information. He did not, however, identify or return any external storage devices or other Keenan property. He did turn in his Keenan printer on October 4, 2021 that he stated he forgot to bring back on his last day.

59.     On Brown's last day, Keenan provided Brown a letter dated September 30, 2021 reminding him, *inter alia*, of his obligations to return all Keenan files and Keenan Confidential Information:

> Additionally, please note paragraph 9. b, which states, "Upon the ending of Employee's employment with the Company, Employee shall forthwith deliver to the Company all Company Materials and all materials in Employee's possession, custody or control and shall not download, delete, transfer or transmit any Company Materials without Company oversight or approval beforehand." It is your responsibility to ensure that we receive all Company Materials that may be in your possession no later than 7 days from receipt of this letter.

60.     On October 6, 2021, Newfront issued the following press release ("**October 6 Press Release**"), announcing the hiring of Brown to service "his Employee Benefits clients" on Newfront's behalf and him joining Newfront's "Rapidly Growing Employee Benefits Practice":



16

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

"We are delighted to have Keith join Newfront and help deliver a world class service for his Employee Benefits clients," said Brian Hetherington, President at Newfront. "Keith helps us expand in key industry segments and geographies while modernizing the brokerage experience."

"I am very energized to join the Newfront team," said Mr. Brown. "I look forward to bringing my 30+ years experience in employee benefits and insurance carrier relationships to Newfront, with its emphasis on client satisfaction. I believe clients will find that our expertise, leveraged by technology, will help them realize their benefits goals." Mr. Brown is based in Sacramento and serves clients throughout California.

https://www.prnewswire.com/news-releases/keith-brown-joins-newfront-insurances-rapidly-growing-employee-benefits-practice-301394588.html.

61.     As Brown's Newfront Employment Agreement reflects, Newfront incentivized Brown to move business to Newfront because Brown's compensation included a "new business commission split," and a "renewal split," with specified performance targets during the first year. In fact, Brown's Newfront Employment Agreement makes explicit that Newfront's "expectations … are to help ensure that *your book* is transitioning to Newfront at the desired pace[.]" Of course, Brown was not the "owner" of any book of business; any accounts for which he provided services or generated on behalf of Keenan were Keenan's clients, not Brown's.

62.     The October 6 Press Release displayed above makes it plainly clear – Newfront intended to "rapidly grow" an employee benefits practice, with a strategy encouraging new hires such as Brown to solicit Keenan clients to transfer to Newfront, *i.e.*, as the Press Release states—to join Newfront and "help deliver a world class service for *his* employee Benefits clients."

**G.     Soon After Brown Leaves, Keenan Discovers that Brown Was, In Fact, Competing for Keenan Business And Was Doing So Through the Misuse of Keenan Trade Secrets and Keenan Confidential Information.**

63.     In the weeks following Brown's departure, Keenan learned that, contrary to Brown's representations, Brown was in fact competing with Keenan—even before he left Keenan—and that he was doing so through the misuse of Keenan Trade Secrets and Keenan Confidential Information.

64.     In particular, Keenan learned that Brown was soliciting one of the two Keenan JPAs, **MCSIG**, for Newfront's benefit even before he left Keenan and asking MCSIG's Executive Director to re-message his exit so as not to suggest that he was leaving the sector. Instead, Brown asked the Keenan client's Executive Director to say something different: "If possible, instead of mentioning I am going to

chase commercial groups, or leaving schools…I would say I am joining a consulting firm that is focused on bringing new technologies to employee benefits and consulting."

65.    In this same email chain with MCSIG's Executive Director on September 24, 2021, Brown solicits MCSIG by telling her that he would be "coming back … as your enrollment and eligibility solution in 2022." Brown obviously was messaging to this Keenan client – while he was still acting on behalf of Keenan – to plan on transferring its business to Brown's new employer once he made his move:

---

**From:** Keith Brown <kbrown@Keenan.com>
**Sent:** Friday, September 24, 2021 9:54 AM
**To:** 'Buckner, Roxanne' <RBuckner@mcsig.com>
**Subject:** RE: Alum Rock

I am coming back with AFA as your enrollment and eligibility solution in 2022.

*Keith Brown*
Keith Brown
Vice President
*Keenan*
Innovative Solutions. Enduring Principles.
License No. 0451271
p: 408.441.0754 ext. 6167
e: kbrown@keenan.com | w: www.keenan.com
1732 North First Street, Suite 100 | San Jose, CA 95112

Please follow us on: Facebook | LinkedIn | Twitter

*Exceptional customer service is a top priority at Keenan. If there is anything I can do to improve your experience or if you would like to provide feedback, please feel free to contact my manager, Kelly Hall, 510.986.6761 ext. 8166, email: khall@keenan.com.*

---

**From:** Buckner, Roxanne <RBuckner@mcsig.com>
**Sent:** Friday, September 24, 2021 9:09 AM
**To:** Keith Brown <kbrown@Keenan.com>
**Subject:** RE: Alum Rock

I understand! we will not be mentioning where or what, I feel that is your story if you choose to tell. I will make sure Rory knows too that its not necessarily commercial (like he mentioned the other day) and he got that from me unfortunately, as I had talked to him before I knew more other than what was shared with me on that dreadful Friday ;-) Gosh, we are sure going to miss you!

---

**From:** Keith Brown [mailto:kbrown@Keenan.com]
**Sent:** Friday, September 24, 2021 8:59 AM
**To:** Buckner, Roxanne <RBuckner@mcsig.com>
**Subject:** RE: Alum Rock

Will you have a write up on my exit from Keenan?

If possible, instead of mentioning I am going to chase commercial groups, or leaving schools…I would say I am joining a consulting firm that is focused on bringing new technologies to employee benefits and consulting.

*Keith Brown*
Keith Brown
Vice President
*Keenan*

---

66.    Keenan also learned that, after resigning, on October 15, 2021, Brown used his knowledge of Keenan Trade Secrets and Keenan Confidential Information to attempt to set up a meeting with another Keenan client—**Oak Grove School District**—to solicit its business with insight gained exclusively from the Keenan Trade Secrets and Keenan Confidential Information he acquired while

18

employed at Keenan. On October 15, 2021, Brown sent the following email to this client from his personal email account even though he was already employed by Newfront at the time in an effort to conceal his solicitation of the client:

From: **KEITH BROWN** <kbrown02@aol.com>
Date: Fri, Oct 15, 2021 at 9:34 AM
Subject: Kaiser policy
To: <jmanzo@ogsd.net>

Let's discuss at your convenience

Sincerely,
Keith Brown

67.    Keenan also learned that, on October 28, 2021, Brown used his knowledge of Keenan Trade Secrets and Keenan Confidential Information to directly solicit another Keenan client—**Fremont Unified School District**. In his email to this Fremont Unified School District client on October 28, 2021, Brown seemingly picked up where he left off from discussions that he had with this Keenan client before he left Keenan. For example, Brown proposed solutions to concerns expressed amongst employee groups that, upon information and belief, were concerns expressed to him while he was an employee of Keenan and that, at minimum, constitute Keenan Confidential Information. The remainder of this email is not included below because it contains Confidential Information that Brown acquired through his employment with Keenan about this client's particular needs, concerns, and issues, which was not publicly available information or readily ascertainable through proper means.

From: **Keith Brown** <keith.brown@newfront.com>
Date: Thu, Oct 28, 2021 at 3:22 PM
Subject: Broker of Record Discussion
To: <npfeiffer@fusdk12.net>

Hi Nancy,

I hope this email finds you well. Per our discussion, I would like to obtain the broker of record designation for the Fremont Unified School District, which would accomplish a few goals:

68.    Keenan also learned that Brown had been contacting individuals whose information he acquired as a result of Keenan's funding during his employment of his membership in a professional organization, **CASBO**, intended for Keenan's benefit. Brown had been telephoning or otherwise contacting these individuals using information he acquired while employed at Keenan, but he was doing so for the benefit of Newfront.

19
COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

69.    Keenan's discoveries of Brown's lies and unlawful solicitations prompted a series of letters between counsel for Keenan and counsel for Brown. Despite the obvious nature of his solicitations, Brown took the position that he was actually not soliciting Keenan clients and denied misappropriating Keenan's Trade Secrets or Confidential Information.

70.    On October 29, 2021, Keenan sent a cease-and-desist letter ("October 29th Cease & Desist Letter") to Brown, enclosing a copy of his Agreement, and reminding him of his obligations set forth in the Agreement including the requiring that he never at any time use Keenan's Confidential Information except as allowed in his Agreement. Keenan demanded that Brown cease any further violations of his Agreement. Keenan also demanded that Brown preserve any Keenan information and files that he possessed—although Keenan had been told by Brown that the only files or property of Keenan he possessed was on the Brown Laptop that he returned at the conclusion of his employment.

71.    On November 2, 2021, Brown's attorney responded, expressing Brown's denial of the accusations and taking the position that he was merely provided "excellent customer service" on behalf of Keenan, even *after* he left.

72.    On November 17, 2021, Keenan wrote again, surprised at Brown's position that he had not been soliciting and reminded Brown of his solicitations of MCSIG, the email proof quoted above, along with evidence of Brown's solicitations of other Keenan clients. One such example highlighted in Keenan's November 17th letter noted Brown's explicit solicitation of the Fremont Unified School District by Brown's email stating, "I would like to obtain the broker of record designation for the Fremont Unified School District."

73.    On November 22, 2021, Brown's attorney responded further, once again denying any wrongful conduct.

**H.    Keenan Undertakes a Forensic Investigation That Is Ongoing But Has Already Discovered that Brown Downloaded Keenan Trade Secrets and Keenan Confidential Information**

74.    On or about February 14, 2022, Keenan received a Broker of Record Letter from Oak Grove School District appointing Newfront as its broker-of-record for its benefits insurance effective April 1, 2022. Oak Grove School District is a member of the JPA known as **SMCSIG**, which was among the Keenan clients assigned to Brown during his employment at Keenan.

75.    The receipt of the **Oak Grove School District** BOR letter prompted a larger concern, to wit, given that Brown had already been misusing Keenan Trade Secrets and Keenan Confidential Information to solicit Keenan clients in the past, and that Keenan's bid for SMCSIG that was due February 28, 2022 may have likewise been compromised and put at a competitive disadvantage if Defendants also submitted a bid. The SMCSIG bid request, called Request for Quotes for Employee Health Benefits, was issued the week of January 10, 2022, with bidders submitting sealed proposals by February 28, 2022. The contract is scheduled to be awarded on April 29, 2022. Keenan is informed and believes that, if Defendants submitted a bid to SMCSIG, they did so with the use of SMCSIG-related files taken by Brown as set forth below and/or other Confidential Information that Brown acquired solely through his employment with Keenan.

76.    Based upon these concerns, Keenan engaged a computer forensics consultant to analyze the Keenan-owned laptop Brown was assigned at Keenan that he returned upon his resignation. Starting on March 17, 2022, and continuing through the filing of this Complaint, Keenan began to receive initial findings and reports from the forensics consultant. While the forensic analysis is continuing, the results already show brazen actions on the part of Brown, as set forth below.

a.    On June 9, 2021, within days of a meeting between Brown and Newfront, Brown inserted, *for the first time*, a Seagate USB External Hard Drive, S/N: NA7HKZP9 ("Seagate KZP9 Device"). The Seagate KZP9 Device continued to be frequently used each month up through Brown's departure of September 30, 2021.

b.    On June 11, 2021, a day after receiving confirmation of his June 14 meeting with Newfront's CEO and other Newfront executives, Brown saved to the Seagate KZP9 Device several folders named "SMCSIG Marketing", "SMCSG Open for Business", and "Sequioa Mktg".

i.    The first folder Brown copied to the Seagate KZP9 Device had the pathway, "D:\My Passport(G#)\061121 KEENAN\SMCSIG Marketing". Brown accessed this folder from the Seagate KZP9 Device on June 11, 2021, which means this folder and its contents are on the Seagate KZP9 Device. Keenan has been unable to locate this folder in its systems or on the Keenan laptop returned by Brown. Based on the folder path and Keenan's knowledge of Brown's work activities at

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

FP 43686929.6

Keenan, this folder would contain Trade Secrets and Confidential Information pertaining to the SMCSIG JPA. Brown had marketed to multiple insurance carriers and would have current rates and plans for each of the participating districts in this JPA and all of the rate information that the quoting carriers provided in their proposal to Keenan, rate information that is not publicly available to Keenan's competitors. This folder may also contain information from Keenan underwriting with proprietary formulas on how Keenan reviews carrier ratings, which would not be available to a competitor.

ii. The second folder Brown copied to the Seagate KZP9 Device had the pathway, "D:\My Passport(G#)\061121 KEENAN\SMCSIG Open for Business". Brown accessed this folder from the Seagate KZP9 Device on June 11, 2021, which means this folder and its contents are on the Seagate KZP9 Device. Keenan has been unable to locate this folder in its systems or on the Keenan laptop returned by Brown. Based on the folder path and knowledge of Brown's work activities at Keenan, this folder would contain Trade Secrets and Confidential Information on insurance plan comparisons and understandings of what happened with this client last year, all of which would provide Defendants with an advantage in negotiating tweaks for this year to help sell business into the JPA. The term "Open for Business" that appears in the folder path is a term Brown used during his employment at Keenan with all the groups that have CalPERS as their medical program but are in the SMCSIG JPA for other lines of business to solicit their medical business to move to the SMCSIG JPA.

c.    On July 28, 2021, Brown received his offer letter and employment agreement from Newfront, as a DocuSign-generated file found in the "Downloads" folder on his Keenan-issued computer indicates this was the date he accessed the document through DocuSign. This same file indicates that Brown electronically signed the Newfront agreement on August 16, 2021.

d.    On August 22, 2021, after he signed his employment agreement with Newfront, Brown copied to the Seagate KZP9 Device several folders named "2018 surveys", "Contract 1 - San

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

Mateo UHSD", "Contract 2 - Bayshore SD", "Contract 4 - Cabrillo USD (Classified)", "Contract 5 - La Honda SD", "Contract 6 - Portola SD", "Desktop as of 041219", "kbrown's files", and "New folder". These folders appear to have been copied from Keenan's sharedrive, as Keenan has identified these folders on its sharepoint with the same folder pathway that appears in the forensic report. Several of these folders contain copies of contracts between Keenan and clients. Other folders contain copies of Brown's desktop and working files, including Confidential Information pertaining to specific clients. Among the files in these folders are "Census" spreadsheets containing private information of employees of Keenan clients, including names, social security numbers, and dates of birth.

    e.  On September 2, 2021, after Brown provided notice of his resignation to Keenan, while the Seagate KZP9 Device was inserted into his Keenan-issued laptop, folders and files named "Aug 21 - Dec 21 Rates for Fremont Unified Board Meeting.xlsx", "Santa Clara USD\2022 smsig kaiser rates.xlsx", "FUSD\2022 fusd illustrative only kb updated 05142021.xlsx" and "FUSD\2021 New Plan Presentation.pptx" were saved to the Seagate KZP9 Device. Of particular note are three files that Plaintiff has been unable to find:

     i.  **"D:\My Passport(G#)\061121 KEENAN\FUSD\Aug 21 - Dec 21 Rates for Fremont Unified Board Meeting.xlsx"**. Keenan has been unable to locate this file in its systems or on the Keenan laptop returned by Brown, but this filename indicates that it would contain Trade Secrets and Confidential Information. Based on folder path, filename, and Keenan's knowledge of Brown's work activities at Keenan, this file likely contains Trade Secrets and Confidential Information specific to "FUSD", or Fremont Unified School District, which is a Keenan client. Upon information and belief, this file contains information that would help Defendants prepare to solicit FUSD out of CalPERS for medical benefits building off the rates Keenan used last year.

     ii.  **"D:\My Passport(G#)\061121 KEENAN\FUSD\2022 fusd illustrative only kb updated 05142021.xlsx"**. Keenan has been unable to locate this file in its systems or on the Keenan laptop returned by Brown, but this filename indicates that it would contain Trade Secrets and Confidential Information. Based on folder path,

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

filename, and Keenan's knowledge of Brown's work activities at Keenan, this file likely contains Trade Secrets and Confidential Information specific to "FUSD", or Fremont Unified School District, which is a Keenan client. Upon information and belief, this file may contain information on plan comparisons and could be helpful for negotiating benefit plan options using the SMCSIG JPA plans and rates, providing Brown and Newfront an advantage in competing for this client's medical business. May and June are the most critical months when working to bring options to districts with CalPERS medical plans.

iii.   **"D:\My     Passport(G#)\061121     KEENAN\FUSD\2021 New Plan Presentation.pptx"**. Keenan has been unable to locate this file in its systems or on the Keenan laptop returned by Brown, but this filename indicates that it would contain Trade Secrets and Confidential Information. Based on filename and knowledge of Brown's work activities at Keenan, this file likely contains information specific to "FUSD", or Fremont Unified School District, which is a Keenan client. However, a "New Plan Presentation" is how Keenan tells its story to clients and contains proprietary information. Upon information and belief, this file contains information that Defendants can use to compete with Keenan for this business.

f.     On September 15, 2021, while the Seagate KZP9 Device was inserted, folders and files named "SJO007L 0611\CASBO AMC\Conference Attendee List 8.09.2019 v2.xlsx", "SJO007L 0611\CASBO AMC\2019 CAJPA Keenan Events Summary v3 beal darm.xlsx", "SJO007L 0611\CASBO AMC", and "SJO007L 0611\CASBO AMC\041619 Meeting.pdf" were saved to the Seagate KZP9 Device. These are business files of Keenan pertaining to industry conferences that Brown was involved in at Keenan.

77.    Upon information and belief, Brown downloaded the above-described files and folders onto an external hard-drive to improve his ability to compete for Keenan business.

78.    The initial forensic analysis also discovered that Brown had accessed certain proprietary files and folders, from the same SeagateKZP9 Device that Keenan cannot locate anywhere, not on

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

FP 43686929.6

Brown's Keenan-issued computer, and not on Keenan's sharedrive where Brown should have been saving his working files.

79.     Keenan is informed and believes that it is at imminent risk for suffering further irreparable harm due to the Defendants' misuse of Keenan Trade Secrets and Confidential Information in connection with submitting a bid in response to the SMCSIG-issued Request for Quotes.

80.     Keenan is likewise informed and believes that it is at imminent risk for suffering additional irreparable harm due to the Defendants' active solicitation efforts of Keenan clients with the benefit of stolen Keenan Trade Secrets and Confidential Information.

81.     Upon information and belief, Keenan alleges that Brown's plan is to move as much Keenan business as possible to Newfront by misappropriating Keenan Trade Secrets and Confidential Information, all in violation of the Agreement and federal and state law.

## COUNT I

### DEFEND TRADE SECRETS ACT (18 U.S.C. § 1831 *ET SEQ.*)

### (Against All Defendants)

82.     Keenan incorporates by reference its allegations set forth in paragraphs 1 through 80 of this Complaint as if fully set forth herein.

83.     The files retained by Brown prior to his departure from Keenan are trade secrets of Keenan subject to protection under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1831 et seq.

84.     The information contained in these files is valuable because it is not generally known or readily accessible, through proper means, to others who can profit from its use. Keenan has spent significant sums, in terms of both financial and human resources, to develop and maintain this information, which would be of great value to any competitor.

85.     The information contained in these files and data is related to products or services used in, or intended for use in, interstate commerce.

86.     Keenan takes and, at all times relevant hereto, has taken reasonable measures to maintain the confidential and secret nature of this information. Those steps include: (a) confidentiality, handbook, and IT policies; (b) restricting availability of certain confidential information to key employees; (c) requiring employees to execute agreements with confidentiality provisions and restrictive covenants; (d)

FP 43686929.6

physical security measures to protect against the disclosure of sensitive materials to third parties; and (e) IT security measures, such as password protection for all computers and segregation of certain files so that only employees with a need to access the files can do so.

87.     Brown obtained the information contained in these files and data by improper means in violation of his contractual and other obligations to Keenan.

88.     Brown engaged in this conduct despite acquiring this information under circumstances giving rise to a duty to maintain the information's secrecy and limit its use, which duty Brown owed and continue to owe Keenan as former agents, employees and representatives of Keenan.

89.     Brown went to the trouble of retaining Keenan's trade secrets for the obvious reason that doing so will increase his odds of convincing the clients that he serviced on behalf of Keenan to move their business to Newfront. If the information were not valuable for this purpose, then Brown would not have gone to the trouble of stealing it.

90.     Brown's foregoing conduct constitutes an actual and threatened misappropriation and misuse of Keenan's trade secret information in violation of the DTSA.

91.     Upon information and belief, Newfront acquiesced in the aforementioned conduct by Brown and knowingly received stolen trade secret files that Brown is using on Newfront's behalf and for Newfront's benefit.

92.     As a direct and proximate result of Defendants' actual and threatened misappropriation of Keenan's trade secrets, Keenan has suffered irreparable harm and will continue to suffer irreparable harm that cannot be adequately remedied at law unless he is enjoined from engaging in any further acts of misappropriation and from continued possession in any form of trade secret information belonging to Keenan.

93.     As a direct and proximate result of the above-described acts of misappropriation, Keenan has suffered and/or will suffer damages and irreparable harm, and is entitled to all damages, attorneys' fees, costs and remedies permitted under the DTSA.

94.     Each of the acts of misappropriation, as alleged in Count II, was done maliciously by Defendants, thereby entitling Keenan to exemplary damages to be proved at trial.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

FP 43686929.6

## COUNT II

### BREACH OF CONTRACT

### (Against Brown)

95.     Keenan incorporates by reference its allegations set forth in paragraphs 1 through 93 of this Complaint as if fully set forth herein.

96.     As a condition of the commencement of his employment with Keenan, Brown executed the Agreement.

97.     The Agreement is a valid and enforceable contract that prohibits Brown from using, disclosing, or retaining any of Keenan's Confidential Information except for the benefit of Keenan.

98.     In the Agreement, Brown also consented to the entry of injunctive relief in the event that he breached his contractual obligations.

99.     Keenan has met all of its obligations to Brown under the Agreement.

100.    Brown has breached or plans to breach the Agreement by retaining, using, and/or disclosing Keenan's Confidential Information.

101.    Brown's actions constitute a breach of his Agreement with Keenan.

102.    As a direct and proximate result of Brown's actions in breach of the Agreement, Keenan has sustained and/or will sustain damages and is faced with irreparable harm such that injunctive relief is appropriate.

103.    Pursuant to the terms of the Agreement, Keenan is entitled to recover its attorneys' fees incurred in this action.

## COUNT III

### BREACH OF FIDUCIARY DUTY

### (Against Brown)

104.    Keenan incorporates by reference its allegations set forth in paragraphs 1 through 102 of this Complaint as if fully set forth herein.

105.    By virtue of his status as a high-level employee of Keenan, Brown operated as a fiduciary with respect to Keenan's business and owed Keenan the fiduciary duties of loyalty and care and was required to keep the confidential and business secrets of Keenan inviolate.

27

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

106.     Brown breached his fiduciary duty to Keenan by engaging in misconduct that served his own self-interest and the interests of others rather than the interests of Keenan and has acted in a manner inconsistent with the best interests of Keenan – to wit, (i) intentionally misrepresenting to Keenan that he would not compete for Keenan business at his new job, when, in fact, he did intend to compete but misrepresented his true intentions to diver Keenan so it would not discover Brown's pre-departure solicitations; and (ii) telling at least one Keenan client to change his "exit message" from what he had told Keenan (i.e., that he was leaving the schools) and instead to say that he was simply joining a new broker and would be coming back to service Keenan's client with new solutions on behalf of his next employer, Newfront.

107.     As a direct and proximate result of Brown's breach of his fiduciary duties, Keenan has incurred damages.

108.     The actions of Brown as alleged above were willful and malicious and demonstrate a complete indifference to or a conscious disregard for the rights of Keenan.

## COUNT IV

### TORTIOUS INTERFERENCE WITH CONTRACT

### (Against Newfront)

109.     Keenan incorporates by reference its allegations set forth in paragraphs 1 through 107 of this Complaint as if fully set forth herein.

110.     As a condition of the commencement of his employment with Keenan, Brown executed the Agreement. See Exhibit A.

111.     The Agreement is a valid and enforceable contract that prohibits Brown from using, disclosing, or retaining any of Keenan's Confidential Information except for the benefit of Keenan.

112.     Newfront was aware of the existence of the Agreement between the Brown and Keenan.

113.     Upon information and belief, by encouraging and/or participating in a scheme with Brown to enable his misuse of Keenan Confidential Information to solicit Keenan clients with the benefit of Keenan Confidential Information, Newfront intentionally interfered with the Agreement between Brown and Keenan. Specifically, Newfront intended to induce Brown to disrupt and breach his Agreement with Keenan by the aforementioned conduct.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

114.    As a result of Newfront's intentional acts of interference, Brown breached his Agreement as alleged above.

115.    Newfront has no justification for its intentional interference with the Agreement.

116.    As a direct and proximate result of the actions of Newfront, Keenan has sustained and/or will suffer damages.

117.    The conduct of Newfront was willful and malicious and demonstrates a complete indifference to or a conscious disregard for the rights of Keenan, entitling Keenan to an award of punitive damages.

**PRAYER FOR RELIEF**

WHEREFORE, for the wrongful acts of Defendants complained of in the foregoing counts, Assured respectfully requests the following relief:

A.    Judgment in its favor and against Defendants;

B.    Permanent injunctive relief prohibiting any further wrongful possession, disclosure, and/or misuse of Keenan's confidential and trade secret information, and preventing Defendants from profiting or benefiting from their wrongful conduct;

C.    An order that Defendants return to Keenan, and purge from their possession, custody and control, any and all documents, computer-based files or data, or information in any form, whether originals, copies, compilations or derivations, which were removed from Keenan or Keenan-owned computer issued to Brown by Keenan, or which were obtained by Defendants or anyone acting on their behalf or in concert with him;

D.    An order that Defendants return any and all confidential and/or trade secret information of Assured, and an order prohibiting any further use or benefit from the use of said information;

E.    An order that Defendants refrain from further solicitation of any clients of Keenan that Brown has already solicited through use of Keenan Confidential Information or about whom Brown has otherwise misappropriated such information;

F.    An order that Newfront withdraw as the broker of record for all Keenan clients that Brown solicited through use of Assured Confidential Information;

G.    An award of compensatory damages to Keenan in an amount to be determined at a hearing

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

FP 43686929.6

and/or trial including, but not limited to, the attorney's fees, computer forensic fees and costs Keenan has incurred to investigate and address Defendants' unauthorized access and improper use of Keenan's computers;

H.      An order directing Defendants to disgorge all gross revenues and profits that they or anyone acting in concert or participation with them received as a result of their wrongful conduct, in an amount to be determined at trial;

I.      An award in favor of Keenan for its costs associated with this action, including without limitation its attorneys' fees pursuant to the Agreement and under the Defend Trade Secrets Act;

J.      An award of exemplary damages in an amount twice the total of the damages recovered for actual loss as permitted by 18 U.S.C. § 1836(b)(3)(C);

K.      An award of punitive damages in an amount to be determined at trial;

L.      An award against all Defendants for attorneys' fees pursuant to 18 U.S.C. § 1836(b)(3)(D), and against Brown pursuant to the Agreement;

N.      An award of pre-judgment and post-judgment interest as permitted by law;

O.      An order imposing a constructive trust;

P.      An order that Brown comply with the Agreement; and

Q.      Any such other legal and equitable relief as the Court deems appropriate.


Dated: April 15, 2022                    Respectfully submitted,

                                         FISHER & PHILLIPS LLP


                              By:    /s/ Andrew Saxon
                                     USAMA KAHF
                                     ANDREW E. SAXON
                                     Attorneys for Plaintiff
                                     KEENAN & ASSOCIATES

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

FP 43686929.6

1

## **DEMAND FOR JURY TRIAL**

2    COMES NOW Plaintiff KEENAN & ASSOCIATES and hereby demands a jury trial in the

3    above matter.

4

5    Dated: April 15, 2022                    FISHER & PHILLIPS LLP

6

7    By:    /s/ Andrew E. Saxon
            USAMA KAHF
            ANDREW E. SAXON
8           Attorneys for Plaintiff
            KEENAN & ASSOCIATES
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

FP 43686929.6

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT A

*W. Keith Brown*

## EMPLOYMENT AGREEMENT

This Employment Agreement ("Agreement"), supported by valuable consideration, is executed by the undersigned Employee (hereinafter "Employee") and delivered to **Keenan & Associates**, a California corporation (hereinafter "Company"), on the date set forth below.

1. <u>Principal Conditions</u>. Employee acknowledges that he/she understands and agrees that the provisions hereof are *principal conditions of Employee's employment* with the Company, and that Employee's agreement to abide by all provisions of this Agreement was and is a material inducement to the Company to employ or continue to employ Employee. Employee hereby warrants and represents that Employee has disclosed to the Company any rights or obligations still in effect in connection with any past employment relationship that could affect Employee's ability to perform Employee's obligations under this Agreement.

2. <u>Definitions</u>. For purposes of this Agreement, the following words and phrases have the following meanings:

   a. "Person" means any individual, corporation, trust, estate, partnership, joint venture, company, association, league, group, or other entity of any kind or nature.

   b. An "Affiliate" of a party means a Person who, directly or indirectly, owns or controls, is owned or controlled by, or is under common ownership or control with such party.

   c. "Competing Business" means any Person other than the Company: (i) who attempts to use, in any way, in whole or in part, Confidential Information as defined herein; or (ii) who, while the Company offers a particular product or service, offers or attempts to develop, a competing product or service; or (iii) who seeks to deprive the Company of any Company client.

   d. "Designated Client" means any Person who, as of the date on which Employee's employment with the Company ends for any reason ("Termination Date"), has been the subject of entries in the Company's Activity Tracking database ("AT database") that were made by Employee or at Employee's direction, and who satisfies either of the following criteria: (i) during Employee's employment at the Company, the Company provided products or services to the Person and/or solicited business from the Person; or (ii) as of the Termination Date, the Person is identified as being a target of solicitation by the Company in the Sagitta Database and/or Activity Tracking database. A written listing of "Designated Clients," as defined herein, will be provided to Employee within three (3) days after Employee's Termination Date.

3. <u>At-Will Employment</u>. Employee acknowledges and agrees that Employee's employment with the Company is terminable at will, with or without cause or advance notice. This means that Employee may terminate his/her employment at any time, with or without reason and with or without giving advance notice, and that the Company may terminate the employment of Employee at any time, with or without reason and with or without giving advance notice. No one other than a member of the Executive Board of **Keenan & Associates** ("Keenan Board") is authorized by the Company to enter into an agreement for employment for a specified period of time or make any agreement contrary to this at-will provision. Further, any such agreement must be in writing and signed by a duly authorized member of the Keenan Board.

**Employment Agreement**

**Page Two**

4. <u>Confidential Information</u>.

    a.    In the course of Employee's employment with the Company, Employee has already acquired or will acquire access to confidential and proprietary information of the Company ("Confidential Information") including, without limitation, Confidential Information concerning the operations, business methods, personnel, costs and finances, marketing plans, research, sales, pricing data and legal affairs of the Company and its subsidiaries, affiliates, clients and vendors. Certain of that Confidential Information has been, and/or hereby is, expressly identified to Employee as "Confidential Information" or "Trade Secret" including, but not limited to: (i) the identities, goals, needs, strategic plans and account information of Company clients; (ii) the identities, goals, needs, and preferences of individual decision makers employed by Company clients; (iii) the amount of premiums and commissions paid and/or generated by the sale of particular Keenan products or services, and/or by the sale of Keenan products or services to a particular Company client; (iv) insurance and/or contract renewal timetables for any Company client; (v) the terms (including, without limitation, pricing and billing information) of any contract between the Company and any Company client; and (vi) the Company's data files (including, without limitation, AMS Sagitta, GenSource products, SBPA GBAS, Keenan Intranet Data Warehouse), working papers, reports, procedure manuals and modules. Such information is Confidential Information whether it is intangible (such as a fact known to Employee but not recorded), recorded in written form (as in report or manual) or otherwise recorded (as in an audiotape, film, computer disk or on the Company's network). Employee understands and agrees that the Company's Confidential Information: has independent economic value by not being generally known to the public, competitors of the Company or others who could otherwise obtain economic value from its disclosure or use; is not readily ascertainable from public sources; has been developed and compiled by virtue of the Company expending significant time, effort and cost; and has been, and is, subject to diligent efforts by the Company to maintain the secret, confidential and proprietary nature thereof.

    b.    Without the prior written consent of the Keenan Board, Employee shall not use any Confidential Information or disseminate or disclose any Confidential Information to any Person, whether directly or indirectly, except to the limited extent actually required for Employee to perform his or her responsibilities in the course of his/her employment with the Company. If Employee becomes aware that anyone is engaged in the unauthorized disclosure of Confidential Information, Employee shall immediately inform his/her Manager or the Company's Legal Department. Employee understands and agrees that Employee's obligation to maintain the confidentiality of all Confidential Information shall survive the termination of Employee's employment with the Company, and such obligation shall continue for all time.

**Employment Agreement**
**Page Three**

5. <u>No Conflicts</u>.

   During Employee's employment, Employee shall devote his/her full working time and attention to the Company's business and shall not engage in any of the following conduct: (i) perform services for any Competitive Business; (ii) receive from any source other than the Company any insurance commissions or fees resulting from the sale or renewal of insurance-related products or services ('Insurance Fees"), unless such Insurance Fees constitute deferred payment for services performed by Employee prior to Employee's employment with the Company; and (iii) act as an officer, director, employee, consultant, shareholder, lender or agent of any Competitive Business. Notwithstanding the foregoing, Employee may own up to one percent (1%) of any class of any Person's outstanding securities listed on any national securities exchange, registered under Section 12(g) of the Securities Exchange Act of 1934, or otherwise publicly traded, provided that no more than five percent (5%) of Employee's investment portfolio may be invested at any time in the securities of any one Competitive Business or any one Person that does business with the Company or its Affiliates.

6. <u>Non-Solicitation of Designated Clients.</u>

   While employed by the Company and for a period of nine months following the termination of Employee's employment with the Company for any reason (collectively, the "Non-Solicitation Period"), Employee shall not, without express prior written approval from the Keenan Board, directly or indirectly solicit or attempt to solicit, on behalf of any Person other than the Company, business from any Designated Client. If, during the Non-Solicitation Period, any Designated Client discontinues its receipt of any product or service from the Company (including when such discontinuation results from the Designated Client's failure to renew any insurance policy or other agreement upon its expiration) and purchases a similar product or service from any Person for whom the Employee is then providing services, Employee hereby agrees that it shall be presumed that all such purchases (the "Transition Business") resulted, in part, from Employee's solicitation of business from the Designated Client and/or from Employee's use of Confidential Information concerning the Designated Client and/or that the Company otherwise materially contributed to Employee obtaining the Transition Business. Employee therefore agrees that the Company shall be entitled to receive from Employee, without the need to prove any breach hereof by Employee or any damages to the Company, a Transition Payment in an amount not over fifty percent (50%) of all net commission or other compensation Employee or Competing Business receives as a result of any Transition Business until the next renewal date of the product or service. The Employee agrees that the Transition Payment is a reasonable amount and is not considered a penalty or forfeiture and constitutes a fair estimation of damages which otherwise are too uncertain to ascertain. Such Transition Payment shall be made by Employee or Competing Business on a pro-rated basis as Employee or Competing Business receives payment for Transition Business, and shall not preclude Company from seeking such other remedies as may be available to Company upon proving any actual breach by Employee.

**Employment Agreement**
**Page Four**

7. <u>Non-Solicitation of Employees</u>.  For a period of two years following termination of Employee's employment with the Company for any reason, Employee shall not, without express prior written approval from the Keenan Board, directly or indirectly, solicit or attempt to solicit for employment, on behalf of any Person other than the Company, any Company employee.

8. <u>Non-Interference</u>.  At no time, either during or after Employee's employment with the Company, will Employee induce or attempt to induce any Company client or any consultant, employee, independent contractor, licensee or other third party to sever any relationship with the Company.

9. <u>Ownership</u>.

   a. Employee hereby acknowledges and agrees that all results and proceeds arising out of or resulting from services Employee performs for the Company ("Work Product") shall be deemed works-made-for-hire for the Company within the meaning of the copyright laws of the United States, and the Company shall be deemed to be the sole author thereof in all territories and for all purposes.  To the extent any ownership rights in any Work Product or Confidential Information might be deemed to reside in Employee, Employee hereby assigns all such rights of every kind and character, whether now existing or hereafter existing, to the Company exclusively, for all purposes, without conditions or limitations, and without the reservation of any rights by Employee, in perpetuity and throughout the universe, in any form or media, whether now known or hereafter discovered or invented.  Employee acknowledges and agrees that the Company has hereby notified Employee that the assignment provided for herein shall not apply to any invention that qualifies fully for exemption from assignment under the provisions of Section 2870 of the California Labor Code, a copy of which is attached as Exhibit "A" hereto.

   b. All files (hard copy or saved on Employee's computer, personal or shared drives), records, documents, equipment, specifications, electronic mail and other items relating to the Company's business, whether prepared by Employee or others (collectively, "Company Materials"), are and shall remain exclusively the property of the Company.  Upon the ending of Employee's employment with the Company for any reason, and at such earlier time as may be requested by the Company, Employee shall forthwith deliver to the Company all Company Materials and all materials in Employee's possession, custody or control and shall not download, delete, transfer or transmit any Company Materials without Company oversight or approval beforehand.

10. <u>Notification of Winnings</u>.  Employee will not accept or retain any prizes, trips or other sales-contest awards earned or obtained within the course and scope of employment without first notifying the Company in writing as to the nature and value of such, and obtaining written approval from a member of the Keenan Board within 30 days of receipt of any prize.

**Employment Agreement**
**Page Five**

11. <u>Licenses</u>.  Throughout Employee's employment with the Company, Employee shall obtain and maintain any professional licenses or certifications legally required, or deemed by the Company to be necessary, for Employee's proper performance of his or her employment duties and responsibilities.

12. <u>Injunctive Relief</u>.  The parties acknowledge and agree that the provisions set forth in this Agreement are necessary and reasonable to protect the interests of Employee and the Company, and that any breach or threatened breach of any provision of this Agreement by either party could cause great and irreparable harm to the other party, for which there would be no adequate remedy at law.  Therefore, in addition to any other rights and remedies the parties may have, and notwithstanding any arbitration agreement into which they have entered, the parties agree that either party, without the necessity of proving actual damages, may seek temporary and permanent injunctive relief in an appropriate court in the County of Los Angeles, State of California to prevent the other party from breaching or continuing to breach this Agreement.  The parties agree that the venue is deemed proper in Los Angeles County due to the location of the Company's principal place of business and where any breach of the contract will occur. The parties further agree that the party seeking injunctive relief may obtain such relief without posting a bond or making any undertaking.  Any such requirement of a bond or undertaking is hereby waived, and the parties acknowledge that in the absence of such a waiver, a bond or undertaking might otherwise be required by the Court.  Nothing herein shall prevent either party from pursuing any other legal or equitable remedy available to it for a breach or threatened breach of this Agreement, including but not limited to the recovery of damages.

13. <u>Severability</u>.  If any one or more of the provisions of this Agreement shall, for any reason, be held by the court or other tribunal of competent jurisdiction to be invalid, void or unenforceable, in whole or in part, such adjudication shall in no way affect any other provisions of this Agreement or the validity or enforcement of the remainder of this Agreement, and any provision thus affected shall itself be modified only to the extent necessary to bring the provision within the applicable requirements of the law.

14. <u>Governing Law</u>.  This Agreement shall be governed by and construed in accordance with the laws of the State of California.

15. <u>Entire Agreement</u>.  This Agreement constitutes the entire and complete understanding between Employee and the Company concerning the subject matter referenced herein. Except for any arbitration agreement entered into between Employee and the Company previously or contemporaneously herewith, which arbitration agreement shall remain in full force and effect, all prior representations, agreements, arrangement and understandings between or among Employee and any representative of the Company concerning the subject matter referenced herein, whether oral or written, have been fully and completely merged herein and are fully superseded by this Agreement.

16. <u>No Waiver</u>.  Any failure of the Company to enforce any provision of this Agreement will not be considered a waiver of such provision or of the Company's right to enforce the other provisions of this Agreement.

**Employment Agreement**
**Page Six**

17. <u>Headings</u>.  The headings contained in this Agreement are for reference purposes only, and shall not affect the meaning or interpretation of this Agreement.

18. <u>Attorney's Fees</u>.  In the event it becomes necessary for either party to bring an action to enforce, or for breach of, any provision of this Agreement, then:  (1) if such action is subject to arbitration pursuant to any arbitration agreement then in force between the parties, the entitlement of the prevailing party to recover costs and expenses incurred by the party in the action -- including, without limitation, reasonable attorneys' fees –shall be governed by such arbitration agreement; and (2) if such action is not subject to arbitration, the prevailing party shall be entitled to recover costs and expenses incurred by the party in the action -- including, without limitation, reasonable attorneys' fees.

19. <u>Amendment</u>.  No one other than the Keenan Board is authorized by the Company to amend, rescind or otherwise change any provision of this Agreement, and any such change must be in writing and signed by the Keenan Board to be enforceable.

> I acknowledge that I have carefully read this Agreement, that I understand its terms, that all understandings and agreements between the Company and me relating to the subjects covered in this Agreement are contained in it and that I have entered into this Agreement voluntarily and not in reliance on any promises or representations by the Company other than those contained in this Agreement itself.
>
> I further acknowledge that I have been give the opportunity to discuss this Agreement with my private, legal counsel and have taken advantage of that opportunity to the extent I wish to do so.

_W. Keith Brown_
Employee Name (Print)

_[signature]_                    _8.20.03_
Employee Signature                Date

_[signature]_                    _8-21-03_
Witness Signature                 Date


**PLEASE RETURN TO HUMAN RESOURCES**

# EXHIBIT B



2021

CALIFORNIA
EMPLOYEE
HANDBOOK

judgement and analyze how the situation would seem to you if the roles were reversed. You must report to your manager or Human Resources any situation, circumstance or position which appears to create a conflict of interest with us. Additionally, should you not feel comfortable dealing with someone in local management, our confidential Ethics AlertLine, which is operated by a third party, is available. The AlertLine may be used to register not only conflict of interests, but any concern you might have about our business practices or potential violations of this Handbook, our policies and our procedures. We have provided our confidential Ethics AlertLine information below.

[www.assuredpartners.ethicspoint.com](www.assuredpartners.ethicspoint.com)
855-753-0487

The AlertLine has been created for AssuredPartners and our employees' protection. We should all be accountable for our actions, and this tool provides another means by which we can build that culture of accountability.  In general, our Human Resources and/or Legal department will follow up on any report, and if further information is needed, can request it through the system while you remain anonymous, if desired.

## Code of Conduct and Business Ethics
### Scope
This Code of Business Conduct & Ethics applies to all directors, officers and employees, of AssuredPartners (of the "Company"). Such covered individuals are referred to herein collectively as the "Covered Parties."

### Purpose
The Company expects all Covered Parties to exercise personal integrity in all types of transactions and interactions. This Code of Business Conduct & Ethics: emphasizes the Company's commitment to ethics and compliance with the law; sets forth basic standards of ethical and legal behavior; provides reporting mechanisms for known or suspected ethical or legal violations; and helps prevent and detect wrongdoing. This Code of Business Conduct & Ethics can only serve as a guide as the variety of questions that may arise in the Company's course of business is unlimited. When faced with ambiguous situations, Covered Parties should remember the Company's commitment to high ethical standards and consult with their direct management about the situation and, where appropriate, seek advice and counsel from the corporate Human Resources and Legal teams to ensure that all actions taken on behalf of the Company honor this commitment.

### Corporate Opportunities
Covered Parties may not take opportunities which are Company property for themselves – i.e., using corporate property, information or position for improper personal gain. No Covered Party may use Company property, information or position for improper personal gain, and no employee may compete with the Company directly or indirectly. Covered Parties owe a duty to the Company to advance its legitimate interests whenever possible.

### Fair Dealing
Covered Parties shall behave honestly and ethically at all times and with all people. They shall act in good faith, with due care, and shall engage only in fair and open competition, by treating colleagues, competitors and other third parties in an ethical manner. Stealing proprietary information, possessing trade secret information that was obtained without the owner's consent, or inducing such disclosures by past or present employees of other companies is prohibited. No Covered Party should take unfair

advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts, or any other unfair practice.

The purpose of business entertainment and gifts in a commercial setting is to create good will and sound working relationships, not to gain unfair advantage with customers. No gift or entertainment should ever be offered or accepted by a Covered Party or any family member of a  Covered Party unless it (1) is consistent with customary business practices; (2) is not excessive  in value; (3) cannot be construed as a bribe or payoff and (4) does not violate any laws or regulations. The offer or acceptance of cash gifts by any Covered Party is prohibited. Covered Parties should discuss with Human Resources, Legal or other appropriate personnel any gifts or proposed gifts that they think may be inappropriate.

**Confidentiality**
Covered Parties must maintain the confidentiality of confidential information entrusted to them, except when disclosure is required by law. Confidential information also includes information that third parties have entrusted to the Company. The obligation to preserve confidential information continues even after employment ends.

**Protection and Proper Use of Company Assets**
All Covered Parties should endeavor to protect the Company's assets and ensure their efficient use. Theft, carelessness, and waste have a direct impact on the Company's profitability. Any suspected incident of fraud or theft should be immediately reported for investigation. The Company's equipment should not be used during working hours for non-Company business, though incidental and limited personal use is permitted, provided such use is lawful, consistent with AssuredPartners' policies and procedures, and not antithetical to AssuredPartners' business purposes.

The obligation of Covered Parties to protect the Company's assets includes its Trade Secrets and Confidential Information, as further defined below. Unauthorized use or distribution of Trade Secret and Confidential Information violates Company policy. It could also be illegal and result in civil or criminal penalties.

**Compliance with Laws, Rules and Regulations**
Obeying the law is the foundation on which the Company's ethical standards are built. In conducting the business of the Company, the Covered Parties shall comply with applicable governmental laws, rules and regulations at all levels of government in the United States and in any non-U.S. jurisdiction in which the Company does business. Although not all Covered Parties are expected to know all of the details of these laws, it is important to know enough about the applicable local, state and national laws to determine when to seek advice from Human Resources, Legal or other appropriate personnel.

**Timely and Truthful Public Disclosure**
In reports and documents filed with or submitted to regulators of the Company, and in other public communications made by the Company, the Covered Parties involved in the preparation of such reports and documents shall make disclosures that are full, fair, accurate, timely and understandable. Covered Parties shall not knowingly conceal or falsify information, misrepresent material facts or omit material facts necessary to avoid misleading the Company's independent public auditors or investors.

**Significant Accounting Deficiencies**
Covered Parties shall be responsible for immediately reporting any information concerning (a) significant deficiencies in the design or operation of internal control over financial reporting or (b) any fraud, whether

or not material, that involves management or other employees who have a significant role in the Company's financial reporting, disclosures or internal control over financial reporting. Such reporting may be done through the Ethics AlertLine or, where appropriate, directly to the Audit Committee of the Board of Directors of AssuredPartners, Inc.

**Violations of Ethical Standards**
**Reporting Known or Suspected Violations**
The Company's directors and, officers shall promptly report any known or suspected violations of this Code to the chair of AssuredPartners, Inc.'s Audit Committee. All other Covered Parties should consult Human Resources or other appropriate personnel about known or suspected illegal or unethical behavior or utilize the Ethics AlertLine where appropriate. These Covered Parties may also report questionable behavior in the same manner as they may report complaints regarding accounting, internal accounting controls or auditing matters by notifying (anonymously, if desired) the chair of the Audit Committee. No retaliatory action of any kind will be permitted against anyone making such a report in good faith, and the Company's Audit Committee will strictly enforce this prohibition.

**Accountability for Violations**
If the Company's Audit Committee or its designee determines that this Code has been violated, either directly, by failure to report a violation, or by withholding information related to a violation, the offending Covered Party may be disciplined for noncompliance with penalties up to and including removal from office or dismissal. Such penalties may include written notices to the individual involved that a violation has been determined, censure by the Audit Committee, demotion or re-assignment of the individual involved and suspension with or without pay or benefits. Violations of this Code may also constitute violations of law and may result in criminal penalties and civil liabilities for the offending Covered Party and the Company. All Covered Parties are expected to cooperate in internal investigations of alleged misconduct.

# Trade Secrets and Confidential Information

AssuredPartners' trade secrets, confidential and proprietary information ("Trade Secret and Confidential Information") is vital to our entire business. During your employment with AssuredPartners, you will be provided with, have access to, and be required to maintain strict confidentiality of, Trade Secret and Confidential Information. This Trade Secret and Confidential Information is not known by AssuredPartners' competitors or within the insurance brokerage business generally.

AssuredPartners' Trade Secret and Confidential Information includes all confidential, proprietary, and/or non-public information, whether or not in a written or recorded, electronic or non-electronic, form, concerning the business or affairs of AssuredPartners. Although it would be impossible for AssuredPartners to list each and every document or category of Trade Secret and Confidential Information to which you will be provided access in your employment with AssuredPartners, below are recognized categories and examples of each such category:

**Client and Prospective Client Information**
- Identity, authority, responsibilities or other customized information concerning key client or prospect contacts;
- Insurance preferences and needs;
- Policy types (current and historical);
- Premium amounts;

- Policy expiration dates;
- Client lists, prospect lists, and "book of business" reports;
- Information regarding risk characteristics;
- Information regarding special insurance markets;
- Contracts or arrangements (including special terms and deals);
- Composition and organization of a client's or prospective client's business and identity and preferences of the key decision-making personnel within same;
- Details concerning the structure, conditions, and extent of existing products and services;
- Commission rates;
- Service arrangements; and
- Other data regarding the particularized requirements and preferences of clients or prospective clients, including third-party confidential information.

**AssuredPartners' Financial & Business Information**
- Accounting records;
- Financial forecasts;
- Pricing information;
- Wages and income information;
- Bank records;
- Tax records;
- Acquisition target lists and related due diligence materials concerning those targets;
- Insurance broker relationships and non-public details regarding same;
- Wholesale relationships and non-public details regarding same;
- Vendor relationships and non-public details regarding same;
- Insurance carrier relationships and non-public details regarding same;
- Marketing and servicing plans;
- Underwriting information and services;
- Procedures and techniques;
- Business plans;
- Sales strategies including, but not limited to, training and resources related to the AssuredPartners' Blueprint sales method;
- Employee benefits-related proprietary plans and programs including, but not limited to, AssuredExcellence and CompleteCare;
- Operations;
- Policy forms;
- Proprietary software, web applications, and analysis tools;
- Business strategies and methods; and
- Service and products offered by AssuredPartners to clients or prospective clients;
- Any other financial or business information pertaining to AssuredPartners that is not generally known by third parties.

This Trade Secret and Confidential Information constitutes a valuable asset of AssuredPartners. AssuredPartners has spent considerable time and resources developing and maintaining its Trade Secret and Confidential Information. This information provides AssuredPartners with a competitive advantage. Should this information become public or be obtained by one of AssuredPartners' competitors, it would

be detrimental to AssuredPartners' work and profitability. As such, the value of this information cannot be readily determined or calculated.

AssuredPartners takes the confidentiality of its Trade Secret and Confidential Information very seriously. All AssuredPartners employees are prohibited from using any such Trade Secret or Confidential Information for his/her personal benefit or for the benefit of any person or entity other than AssuredPartners. Employees may not remove, copy, replicate, disseminate, forward (*e.g.*, forward AssuredPartners' emails to an employee's private email account) Trade Secret or Confidential Information, or partner, coordinate or cooperate with third parties to do the same. Further, AssuredPartners restricts access to such Trade Secret and Confidential Information only to those who have a need to know it for AssuredPartners' business purposes.

Signature _____

## Outside Employment

You are hired with the understanding that the Company is your primary employer, and that any other employment or involvement, whatsoever, that is considered by management to be in conflict with the interest of, or reflect on the reputation or public image of, Company is prohibited.  This includes the prohibition against business ventures, personal investments, and outside employment that interfere or conflict with, or create the appearance of any conflict with, the employee's obligations and responsibilities to the Company or the conscientious performance of the employee's duties to the Company.  Such activities must not involve the use of the Company's name, information or good will for personal gain or for the gain of others.

Conflicts of interest could arise in the following circumstances:

- Being employed by, or acting as a consultant to, a competitor or potential competitor, supplier or contractor, regardless of the nature of the employment, while employed with the Company.  An employee must disclose to the Company if he or she has obtained any outside employment or paid relationship that could raise any conflict of interest concerns.
- Hiring or supervising family members or closely related persons.
- Serving as a board member for an outside commercial company or organization.
- Owning or having a substantial interest in a competitor, supplier or contractor.
- Accepting gifts, discounts, favors or services from a customer/potential customer, competitor or supplier, unless equally available to all company employees.

An employee who believes that he or she is potentially involved in a situation which could create a conflict of interest should immediately and fully disclose the relevant circumstances to his or her Supervisor or Human Resources for determination as to whether a conflict exists. If an actual or potential conflict is determined, the Company may take whatever corrective action appears appropriate under the circumstances.  Failure to disclose all relevant facts may constitute grounds for disciplinary action, up to and including termination.

# Receipt of AssuredPartners Employee Handbook

I hereby acknowledge receipt of the Employee Handbook of AssuredPartners. I understand and agree that it is my responsibility to read and comply with the policies in the Handbook.

Violations of these policies and conditions, among others not specified in our handbook, can lead to disciplinary action, up to and including immediate termination.

AssuredPartners reserves the right, consistent with applicable law to change, withdraw, apply, or amend any of our policies or benefits, including those covered in our Handbook at any time, with or without notice and without a written revision of this version of our Handbook. Notification of such changes can be in any common method, such as via email, posting on an intranet, a printed memo, notice, amendment to or reprinting of the Handbook.

We typically collect your "signature" electronically at your time of hire and annually thereafter. By "signing," you acknowledge that you have reviewed AssuredPartners' handbook, that you understand the handbook, that it is your responsibility to read and comply with the policies, as they exist now or as may be amended, and that you are not aware of any violations of our handbook which you have not reported appropriately.

Signature: _____

Date: _____